Tyrane E. **PHYLE**, Plaintiff–Appellant,

v.

Walter **LEAPLEY**, Warden, South Dakota State Penitentiary;  Mark W. Barnett, Attorney General, State of South Dakota, Defendants–Appellees.

No. 94–3330.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1995.

Filed Sept. 18, 1995.

Steven R. Binger, Sioux Falls, SD, for appellant.

Scott M. Bogue, Pierre, SD, for appellees.

Before McMILLIAN, LAY, and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

South Dakota inmate Tyrane Phyle appeals the district court's denial of his petition for a writ of habeas corpus. Phyle argues that his trial counsel provided constitutional-ly ineffective assistance by failing to object to testimony that Phyle had invoked his consti-tutional right to remain silent, by failing to object to testimony about Phyle's prior bad acts, and by failing to request an inconsistent statement instruction. We affirm.

## I.

On the night of April 23, 1988, a masked man robbed Wolfe's Liquor Store in Claire City, South Dakota. Two local residents had previously noticed a yellow pickup truck parked near the liquor store. They pursued the pickup out of town and forced it off the road. The pickup then followed the pursuers to a nearby farm. Police were summoned and arrested Phyle's brother, Larry Phyle, the only person in the pickup when it arrived at the farm. Larry told police that Phyle had robbed the liquor store, while Larry waited in the pickup. Larry pleaded guilty to aiding and abetting the robbery. Phyle was then tried for first degree robbery.

At trial, the liquor store owner, the pur-suers, and Phyle's mother testified for the State, but none could positively place Phyle at the scene of the crime or identify him as the masked robber. Nor was there physical evidence tying Phyle directly to the crime. Thus, brother Larry, a confessed accomplice, was the State's key witness, and Larry's credibility became a critical issue in the hard-fought trial.

Larry Phyle testified that on the night in question the brothers left home in the pickup on an errand for their mother. While driv-ing through Claire City, Phyle suggested they rob the liquor store because it was owned by old people so "nobody would get hurt." The brothers returned to town, and Phyle left the pickup with a shotgun. Larry parked the pickup near the liquor store. A short time later, when Larry heard a thump in the back of the pickup, he drove out of town, as Phyle had instructed. Before being forced off the road, Larry heard a rap on the pickup's rear window, slowed down, and as-sumed Phyle had jumped out the back and escaped. Larry admitted he did not see Phyle enter the liquor store, nor did he see Phyle again that night after he left their pickup with the shotgun.

Before trial, anticipating that Phyle would testify in his own defense, the prosecutor obtained a ruling that the State could inquire into five of Phyle's prior felony convictions for impeachment purposes "in the event [Phyle] testifies at trial." Phyle did not testify, however, and the defense rested at the close of the prosecution's case. The jury convicted Phyle of first degree robbery, and he was sentenced as an habitual offender to forty years in prison. The conviction was affirmed on appeal. *State v. Phyle*, 444 N.W.2d 380 (S.D.1989). Phyle petitioned the state court for a writ of habeas corpus, presenting the ineffective assistance issues raised on this appeal. That petition was denied without a hearing, and the Supreme Court of South Dakota affirmed, with two justices dissenting because the State did not present trial counsel's testimony explaining his challenged trial tactics. *Phyle v. Leapley*, 491 N.W.2d 429, 436–38 (S.D.1992). Phyle then filed this petition for federal habeas corpus relief. After an evidentiary hearing at which trial counsel testified, the district court denied relief, and Phyle appeals.

## II.

■ Phyle first argues that trial counsel was ineffective for not objecting to a comment about his invocation of *Miranda* rights. Following the robbery, Phyle fled South Dakota and was eventually apprehended in Oklahoma. Roberts County Sheriff Neil Long brought Phyle back to South Dakota. In his opening statement at trial, defense counsel said, "our evidence will show you that never once was Ty Phyle actually questioned after [police] did talk to him." No doubt concerned that the defense was planning to portray the criminal investigators as careless because they prejudged Phyle guilty, the prosecutor called Sheriff Long as a witness and asked:

Q: Now, Sheriff Long, did you interview Ty Phyle when you picked him up down in Bartlesville, Oklahoma?

A: No, I didn't.

Q: And why didn't you interview him?

A: ....[W]e advised him of his rights. And he basically told us that he was gonna get a hold of an attorney and he was gonna get off this bum rap up here in Sisseton.

Q: And so did you interview him at that time?

A: No, I can't interview somebody after they indicated they want an attorney. At least I don't consider it proper.

Phyle argues that counsel ineffectively "invited" and then failed to object to this prejudicial comment on Phyle's decision to invoke his constitutional right of silence. At the evidentiary hearing in the district court, defense counsel explained this aspect of his trial strategy:

Ty wanted the jury to know that from the very beginning he always maintained his innocence, and that he was telling that sheriff and everybody else that he was innocent, and that he didn't commit the crime. And even though he exercised his rights under the Miranda warning, he still wanted that jury to know that he was telling them in Oklahoma; he was telling them everywhere that he didn't commit the crime and that he was not guilty.

Trial counsel's strategic decisions "are virtually unchallengeable." *Wing v. Sargent*, 940 F.2d 1189, 1191 (8th Cir.1991), quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984). Viewed in this light, Phyle's contention is without merit. With Phyle's approval, counsel's strategy included the fact that Phyle denied his guilt from the moment he was arrested. To implement that strategy, counsel raised the issue in opening argument. That provoked the prosecutor's questioning of Sheriff Long, who testified that Phyle complained of a "bum rap," the very point that defense counsel wanted to make.[1] Whether the point was made for the defense on Sheriff Long's direct or cross examination was obviously immaterial. And the fact that

---

1. Defense counsel reinforced the point in cross exam:

Q All right. Now did Ty Phyle maintain his innocence all the way back to South Dakota?

A Basically, yes.

Sheriff Long encased the point in self-praise for respecting Phyle's *Miranda* rights did not change the strategic equation. Thus, from the defense standpoint, Sheriff Long's testimony was a *positive* comment about Phyle's post-arrest statements, and an objection on constitutional grounds might well have been overruled. But in any event, counsel was not ineffective in eliciting this testimony.

### III.

■ Phyle next contends that counsel was ineffective by failing to object to Larry Phyle's testimony of prior bad acts by Phyle. Some of this testimony concerned Phyle's prior convictions; the rest concerned other kinds of bad acts or statements. Some came during the prosecutor's direct examination of Larry, the rest during cross or redirect. Some was elicited by the questioner, the rest blurted out by Larry in answers that were frequently non-responsive.

Trial counsel was questioned at length about most of this testimony at the district court's evidentiary hearing. Counsel initially explained his strategic perspective on this issue:

> Well, it looked to me like the State had to rely heavily on Tyrane's brother, Larry Phyle, to win that case. And it appeared to me that they were going to make a sweet deal for Larry Phyle, and they kept him out of the penitentiary. They had him around the jail. He was walking around the courthouse, from what we heard. He was going back and forth to the State's Attorneys office to prepare the case.
>
> So we felt the only way we could win our case was to discredit ... Larry Phyle and to impeach him. However, in talking with [Phyle], we knew that there was gonna be some risk in doing this. And the risks would be that when we started cross-examining [Larry] about his background, about his relationship with [Phyle], about different events that had happened in their lifetime, that he could possibly and would blurt out things about prior bad acts of Ty. He would say things that they had done together that might influence the jury the wrong way. He would talk about conduct that, in a rural community would not be acceptable.

\* \* \* \* \* \*

I didn't know for sure what anybody was gonna say. You've got one brother testifying against another brother. You've got a mother testifying about her own son. Who knows what's gonna happen when they get in the witness stand and are under the pressure of a trial. I don't know. You know, they're blood. I didn't know whether [Larry] ... would go after his brother.

With that highly relevant background, we review the specific testimony at issue.

1. Prior to Phyle's trial, the trial court ruled that the defense could use Larry Phyle's prior juvenile and adult convictions to impeach him. To defuse this cross examination, the prosecutor started his direct examination by asking Larry to review his prior criminal convictions. In describing one of his crimes, Larry testified that Phyle "[f]orced us to go into the laundromat and break into the coin machine," resulting in an adult conviction. Phyle argues that defense counsel was ineffective for failing to object to this highly prejudicial testimony. Counsel explained this decision at the evidentiary hearing:

> I felt that this was just going right by the jury, and they were keying in on Larry Phyle. And I thought by objecting at this time, all I would do [was] call attention to the fact that Ty was involved.... And it just seemed to me that if we were gonna discredit this Larry Phyle, why not let ... him tell about all of his criminal activity and the fact that he was not a reputable person.... [S]o I didn't object.

2. Phyle next challenges counsel's failure to object when Larry testified that Phyle had stolen drugs and money from other inmates while in prison. This testimony came initially on direct examination; the context was the prosecutor's attempt to rebut the defense strategy of painting Larry as the beneficiary of a "sweet deal" with the State:

Q Okay. Now recently you pled guilty to Aiding and Abetting in this robbery at Wolfe's liquor store, is that correct?

A Yes, sir.

Q   And did you ask for a suspended imposition of sentence on that charge?

A   I tried to get one but they denied it.

.        .        .        .        .

Q   So you didn't get the sentence that you wanted on that charge?

A   No, I didn't.

Q   Do you know why you're serving your time in the Roberts County jail instead of the state penitentiary?

A   Because basically in the state penitentiary there's been a lot of criminal activity down there that was done over ... the previous time of Mr. Phyle. And ... there's a lot of money and drugs stolen down there and if I would have went down there I was afraid that they would have took it out on me because I was a Phyle.

On cross exam, defense counsel emphasized that Larry received a fifteen year sentence, with ten years suspended, and no time in the penitentiary. Larry repeated that he would avoid spending time at the penitentiary because "Mr. Phyle has done some criminal activities down there." At the evidentiary hearing, defense counsel admitted this testimony did not help the defense, stated he did not object "because I didn't want to call attention to it," and further commented, "I really had the feeling that the way this Larry was babbling on, that the jury was convinced he was just trying to save his own hide and that they wouldn't believe him."

3.   Phyle contends that counsel also should have objected when Larry Phyle repeated prejudicial statements made by Phyle as the brothers were driving toward the scene of the robbery:

Q   And Ty started talking about what?

A   Started talking about prison and he told me that he had criminal activity in his blood and he just couldn't get it out. And then we talked about marijuana and stuff.

Q   What about marijuana?

A   Well, he said that "Sure would be nice to have a joint right now." And I says, "Yeah, it would be nice."

Trial counsel was not asked at the evidentiary hearing why he did not object to this testimony. The conversation was immediately before the robbery and thus was not a *prior* bad act. Counsel could have objected to these statements as unduly prejudicial after Larry blurted them out, *see* S.D.C.L. § 19–12–3, but that kind of objection always runs the risk of reinforcing a relatively minor negative point to the jury.

4.   Phyle next argues that counsel should have objected to Larry's testimony that Phyle had previously assaulted his girl friend and Larry on different occasions. This issue began when Larry asserted on direct examination that he was afraid of Phyle. Defense counsel on cross examination asked Larry why he had lived with Phyle if he was afraid of Phyle. Larry answered that he thought Phyle had changed. Larry then explained on redirect that he moved out of Phyle's apartment after trying to break up a fight between Phyle and Phyle's girlfriend:

[Phyle] took a swing at me and I just backed off and I couldn't do nothing but just sit there and watch him proceed on her.... [H]e gave her a couple black eyes and either bruised her ribs or broke 'em. Give her a bloody mouth.

Larry also described a childhood fight in which Phyle gave Larry two black eyes and scarred one of Larry's pupils. At the evidentiary hearing, counsel explained these failures to object:

[W]e told Ty that there was some risk here that when we start talking about Ty and Larry living together and being in Sioux Falls and doing things and going places, that he may mention some prior bad acts or something that they did, whether it was a crime or whether it was just something that wouldn't sound good to the jury.... But he wanted the jury to know that he and Larry were friendly and that Larry was not afraid of him.

.        .        .        .        .

One of the reasons that I didn't object to some of the things that you brought up in your petition was because at this point in the trial, I think we felt that Tyrane could cover it with his own testimony. We hadn't made up our minds yet for sure whether he was going to testify or not. That was one reason.

Another reason was that many times when you object to something that's already been blurted out or that the witness has talked about, all you do is call attention to it and the jury starts—they pick up on it. Many times when the trial is flowing along, and you're looking at the jury and they don't seem to be overly concerned about the testimony, you let it go.

5. Finally, Phyle argues that trial counsel should have objected when Sheriff Long, testifying to what he had heard from other law enforcement agencies while searching for Phyle, said that a detective from Wahpeton, North Dakota, called and said Phyle "was a suspect in some activity up in Wahpeton." However, two questions later counsel's hearsay objection "to this line of questioning" was sustained, so this ineffective assistance contention is plainly without merit.

To prevail on a claim of ineffective assistance of counsel, Phyle must show that his counsel's performance was deficient and that he was prejudiced by counsel's conduct. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "We have repeatedly warned against secondguessing a lawyer's trial strategy in evaluating claims of ineffective assistance of counsel." *Huls v. Lockhart,* 958 F.2d 212, 215 (8th Cir.1992) (citations omitted). As the Supreme Court said in *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

We conclude that trial counsel's handling of Larry Phyle as a key prosecution witness, including the above-challenged decisions not to object to isolated aspects of Larry's extensive testimony, fell within "the wide range of reasonable professional assistance" that is not constitutionally ineffective. As counsel acknowledged, his overall strategy of challenging Larry's credibility by emphasizing his bad character and "sweet deal" with the prosecution entailed high risk. But it was certainly reasonable given the prosecution's case. Indeed, counsel for both sides believed that the strategy was successful. As the prosecutor graphically testified at the evidentiary hearing:

[Defense counsel] totally disemboweled Larry. He just made him look terrible. He made him look like a lying little punk that was selling his brother down the river to save his own hide and get a good deal with the State.... I knew most of the people on the jury, and I was really watching their reaction. And by the time [defense counsel] got done with Larry, [counsel] had him sitting in the witness chair looking at his feet. He lost all of his eye contact with the jury and it was not good.

These are the kinds of broad, highly subjective factors that trial lawyers must take into account as they make repeated, instantaneous decisions whether to object to a question, whether to move to strike a damaging unresponsive answer, or whether to move for a mistrial when a witness has delivered an unexpected low blow. When we review such trial decisions, the ineffective assistance standard is high—they are "virtually unchallengeable"—in part because appellate judges cannot recreate from a cold transcript the courtroom dynamics that are an essential part of evaluating the effectiveness of counsel's performance. *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.10, at 95 (1984).

Here, at an evidentiary hearing held long after the trial, an experienced criminal defense attorney defined his reasonable strategy for dealing with witness Larry Phyle and sensibly explained how that strategy and his general approach to evidentiary objections produced his decisions not to object to specific portions of Larry's testimony. Phyle, no stranger to criminal proceedings, did not testify at that hearing. Thus, defense counsel's testimony that Phyle took an active part in devising their trial strategy and tactics stands unrebutted. On this record, we agree with the district court that counsel's performance was not constitutionally deficient.

## IV.

■ Finally, Phyle challenges counsel's failure to request a jury instruction that a witness's credibility may be attacked by the use of prior inconsistent statements. At the evidentiary hearing, counsel explained: "We had the [South Dakota Pattern Jury Instructions] available, of course, and when we reviewed all of the instructions, we felt that they were sufficient to cover all areas and aspects of the trial." The South Dakota Supreme Court concluded "that the instructions, when read as a whole, properly and sufficiently instructed the jury fully and correctly on the law." *Phyle v. Leapley*, 491 N.W.2d at 435. That being so, counsel's tactical decision not to request a discretionary instruction was plainly not ineffective assistance.

Our review of the trial record, illuminated by the trial attorneys' testimony at the evidentiary hearing, convinces us that Phyle was vigorously defended in a fundamentally fair trial. The judgment of the district court is affirmed.